**STANDARD CHARTERED BANK, a United Kingdom corporation, et al., Plaintiffs,**

**v.**

**Paul MILUS and Kathy Milus, Defendants.**

**and Related Cross–Actions.**

**Civ. Nos. 89–039–PHX–RGS, 90–119 PHX–RCB.**

United States District Court, D. Arizona.

Aug. 14, 1990.

Leo R. Beus, Michael R. Devitt, L. Richard Williams, Beus, Gilbert & Morrill, Phoenix, AZ, for plaintiffs.

Stephen E. Silver, Burch, & Cracchiolo, PA, Phoenix, AZ, for defendants.

## ORDER

STRAND, District Judge.

This case arises out of the allegedly fraudulent activities of Paul Milus, formerly executive vice president and chief credit officer of United Bank ("Bank"). Milus allegedly gave millions in undercollateralized loans to two financially illiquid borrowers—Victorio Company ("Victorio") and Lawrence Malanfant ("Malanfant")—to keep loans to them from going into default and being written off of the Bank's books.

Milus' alleged motivation for keeping the Victorio and Malanfant loans afloat stems from the then-pending purchase of the Bank by Union Bank of California, a subsidiary of plaintiff Standard Chartered Bank. Milus stood to gain personally from the sale because he owned many shares of United Bank stock acquired through a stock option plan. Those shares had increased in value as a result of the pending sale, and would decrease substantially should the pending sale fall through. Writing off the Victorio and Malanfant loans would have allegedly put the upcoming sale of the Bank in jeopardy, because Union Bank of California could have canceled the purchase if, before closing, the Bank suffered any materially adverse change in its financial condition, or if its stockholder equity did not equal 135 million dollars.

Plaintiffs have sued, in this consolidated action, both Milus and United States Fidelity and Guaranty Co. ("USF & G"). USF & G is in the case because it issued a financial institution bond to the Bank, which the Bank asserts insures the loan losses it suffered from Milus' alleged conduct. USF & G has filed a motion to dismiss, or alternatively, for summary judgment, on the ground that the financial institution bond does not cover losses stemming from Milus' conduct.[1]

The applicable provision of the financial institution bond reads:

[USF & G] ... agrees to indemnify the insured for:

### FIDELITY

(A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a) to cause the Insured to sustain such loss, and

---

1. Defendant USF & G filed three companion motions, which were ruled from the Bench on July 16, 1990.

(b) to obtain financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was *in collusion* with one or more parties to the transactions and has received, *in connection therewith,* a *financial benefit* with a value of at least $2,500.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

Defendant USF & G exhibit A (Financial Institution Bond, Fidelity Insuring Agreement A) (emphasis added).

USF & G argues that the Bank's losses from the Victorio and Malanfant loan transactions are not within coverage of the above fidelity clause on three grounds. First, it argues that Milus was not in collusion with either Peter Wray, the principal officer and Milus' main contact at Victorio, or Lawrence Malanfant. Second, it argues that the term "in connection therewith" requires that any financial benefit derived by Milus must have come from Peter Wray of Victorio or Lawrence Malanfant in the form of a bribe or kickback. Finally, USF & G argues that the benefit Milus allegedly derived from the enhanced value of stock received from a stock option plan qualifies as "employee benefits earned in the normal course of employment". As explained below, the court concludes that there was no evidence to support a finding of collusion between Milus and either Peter Wray of Victorio, or Lawrence Malanfant. Therefore it need not address USF & G's second and third contentions.

COLLUSION

By the terms of the Fidelity Agreement, coverage would not apply unless Peter Wray of Victorio and Lawrence Malanfant colluded with Milus in connection with their respective loan transactions. The term "collusion" is not defined by the contract. But the parties agree that the term collusion is synonymous with the term conspiracy as it is used in the criminal context.

Plaintiff argues that under the analysis of *Direct Sales v. United States,* 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943) there was tacit collusion between Milus and Peter Wray, and between Milus and Lawrence Malanfant. In *Direct Sales,* the Supreme Court upheld a conviction of a pharmaceutical manufacturer for conspiracy with a doctor to distribute narcotics, over objection that the there was insufficient evidence of agreement. The company had provided "vast" quantities of morphine sulfate to the doctor, who had a rural practice in a community of 2,000. The doctor purchased over 79,000 units of morphine sulphate per year, when the annual requirement of the average doctor was 400 units. The government had warned the company repeatedly that doctors ordering large quantities were selling the morphine illegally. Nevertheless, the company continued to "push" the illegal sale of morphine tablets by offering substantial quantity discounts. The court concluded that under those facts, it was possible for a jury to infer conspiracy, or concert of action between the doctor and pharmaceutical company, based on the company's clear, unequivocal knowledge that the doctor was putting the morphine sulphate to illegal use, plus the company's efforts to promote his activities by providing quantity discounts. *Id.* at 710–11, 63 S.Ct. at 1268–69.

Plaintiffs assert that the facts of this case parallel *Direct Sales* because first, Milus approved the loans in question under such egregious circumstances that Peter Wray and Malanfant must have known that Milus was approving the loans for his own unauthorized purposes; and, second, Peter Wray and Lawrence Malanfant encouraged those unauthorized approvals by providing Milus with substantially overvalued or worthless collateral, such as grossly high appraisals on land securing the loans and valueless third and fourth mortgage positions on land and artwork.

Defendant USF & G objects to plaintiffs' use of the *Direct Sales* tacit agreement theory, asserting that under Arizona law, the existence of a conspiracy between Milus and Peter Wray, and Milus and Malanfant requires evidence of agreement between them

to exchange a benefit for the loans. The court finds it unnecessary to examine the extent to which *Direct Sales* constitutes Arizona law, because even under the *Direct Sales* approach, the facts of this case do not create a sufficient inference of tacit collusion.

To begin with, in *Direct Sales* the Supreme Court lowered the quantum of proof necessary to show that the pharmaceutical company knew of the doctor's illegal activity, because morphine sulphate could only be used legally under a tightly regulated set of circumstances. *Id.* at 711, 63 S.Ct. at 1269. In contrast, loans are not a commodity inherently susceptible to illegal abuse. Therefore the mere act of procuring a loan, even one given negligently or recklessly by the loan officer, does not inherently place a borrower on notice of possible illegal activity on the part of the loan officer approving the loan transaction.

■ The fact that the loans were allegedly supported by worthless collateral does not support an inference that Peter Wray or Lawrence Malanfant knew of or intended to promote Milus' scheme, because there is no allegation that Peter Wray or Lawrence Malanfant engaged in activity knowingly designed to encourage the *unauthorized* lending of funds. In particular, while plaintiffs have alleged that Peter Wray and Malanfant submitted undervalued or worthless collateral in exchange for the loans, there is no allegation that the collateral was misrepresented directly to the bank at Milus' behest, and there has been no evidence submitted that the collateral offered was beyond the range of practice in the commercial lending industry during the years in question.

■ Even assuming Peter Wray and Lawrence Malanfant were put on notice that Milus was lending money negligently, or even recklessly, their continued efforts to seek loans alone do not create an inference of conspiracy under the *Direct Sales* analysis. The *Direct Sales* court took pains to distinguish between knowledge of the possibility that the other party may be engaged in an illegal act, and knowledge upon which an inference of intent to promote, or joinder of purpose can be based. It is intent, when given effect by overt act, that is the "gist of

conspiracy". *Id.* at 711, 63 S.Ct. at 1269. The court made it clear that though knowledge is the foundation of intent, knowledge cannot support an inference of intent to promote the illegal act unless evidence of the knowledge is clear and unequivocal. This limitation avoids allegations of conspiracy being made by piling inference upon inference. *Id.*

In *Direct Sales,* the regulated nature of morphine, its inherent susceptibility to misuse, combined with the vast quantities sold led to the inescapable conclusion that the company knew of the doctor's illegal activity and intended to promote it. In this case, there is no clear and unequivocal evidence, nor even the allegation, that Peter Wray or Lawrence Malanfant knew of Milus' alleged scheme to protect the value of his stock. In fact, there is no evidence that Peter Wray or Lawrence Malanfant knew of the upcoming sale, knew Milus had a personal stake in it, or were aware of the effect the calling of their loans could have on the sale. Absent such allegations, it is a stretch of logic to infer intent to promote Milus' allegedly fraudulent scheme from the act of seeking negligently, or even recklessly made loans, when it was equally likely that Milus' conduct could be attributed to a work-out strategy for the Victorio and Malanfant loan portfolios. *Cf. Miller v. U.S.,* 382 F.2d 583 (9th Cir.1967) (In the criminal conspiracy context, where two inferences—one positive and one negative—of knowledge of the other's illegal scheme are equally valid, the defendant is entitled to the one which favors him).

In conclusion, though there are numerous allegations that Milus misrepresented the quality of collateral, and the status of the loan portfolios to the Bank, there is no evidence that Peter Wray or Lawrence Malanfant actually knew of these internal misrepresentations, or knew of Milus' stock scheme. Nor is there evidence that they in any way encouraged loans under circumstances that would indicate an intent to promote Milus' alleged scheme in particular, or the granting of unauthorized loans in general. Absent such evidence, the mere fact that the loans were made negligently or recklessly, and that Peter Wray and Lawrence Malanfant

aided the negligent or reckless granting of such loans, is not sufficient to create an inference of conspiracy, collusion, or joinder of purpose under the *Direct Sales* analysis.

Accordingly,

IT IS ORDERED, granting defendant USF & G's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment Re: Coverage Issues.